IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 11 CR 0779-6 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| TRACY L. CONLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is defendant Tracy L. Conley's motion for compassionate release brought pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). The Court conducted oral arguments on January 6, 2021. After careful consideration of the legal memoranda, including the supplemental memoranda filed after oral arguments, and the parties' oral arguments, the Court, in its discretion, grants Conley's motion.

**Background**

Conley's prosecution and conviction were the result of a former practice used by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") of engaging in sting operations where undercover agents provided individuals with the opportunity to rob drug stash houses that did not exist. The ATF's practice involved enticing individuals, most of whom were impoverished racial minorities, into "conspiring to rob fictitious stash houses of fictitious drugs or money operated by fictitious drug dealers." *United States v. Paxton*, No. 13 CR 0103, 2018 WL 4504160, at *1 (N.D. Ill. Sept. 20, 2018) (Gettleman, J.).

A brief summary of the evidence adduced at Conley's January 2014 trial begins with an undercover ATF agent approaching Conley's co-defendant Myreon Flowers with the opportunity to rob a false stash house of an alleged drug boss explaining the type and quantity of drugs and

emphasizing the need for guns. Myreon then recruited his brother David Flowers and cousins Dwayne Jones and Anwar Trapp into the scheme. The cousins met on October 31, 2011, for the purpose of planning the robbery of the drug stash house. Because the ATF agent strongly emphasized the need for guns, at that meeting, the cousins discussed recruiting Anthony Adams for their scheme because Adams had a gun. On November 1, 2011, David, Myreon, and Trapp met with Adams. Later that same day, David, Trapp, and Adams picked up Conley during a happenstance meeting and took him back to his apartment to discuss the robbery. According to Trapp's trial testimony, Myreon then told them the details of the robbery and discussed that Adams, Conley, and another person would assist in the robbery. Unbeknownst to Conley, the Flowers family, or the other participants, the robbery was targeting a false stash house set up by the ATF.

Upon his arrest, Conley provided a statement that he had gone to his regular job on November 1, but was sent home early. He did not have enough money to purchase gas for his car ride home, so he agreed to help his acquaintance Adams clean his apartment. Adams then took Conley to meet the others. That same day, and at Myreon's direction, two vans were driven in furtherance of the robbery. Later that day, Conley, Adams, and another individual arrived at David's home and got into one of the vans. Both vans were driven to a forest preserve where federal agents stopped and arrested the occupants of both vans that contained a total of three firearms. Conley denied having firearms, which agents found wrapped in a towel in a tool box behind the driver's seat.

On January 24, 2014, a jury convicted Conley of the following counts in the April 2012 indictment: (1) conspiracy to possess with intent to distribute five kilograms or more of mixtures containing cocaine in violation of 21 U.S.C. §§ 841(a), 846 (count 1); (2) attempt to possess with intent to distribute five kilograms or more of mixtures containing cocaine in violation of 21 U.S.C. §§ 841(a), 846 (count 2); (3) possession of a firearm in furtherance of a drug trafficking crime in

violation of 18 U.S.C. § 924(c)(2) (count 3); and (4) unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (count 5). On October 19, 2015, the Court sentenced Conley to 120 months in prison for counts 1, 2, and 5 to run concurrently and 60 months for count 3 to run consecutively for a total of 180 months in prison. The Court's sentence was based, in part, on a "fictious" quantity of drugs in this false stash house case, which resulted in mandatory minimum sentences under 21 U.S.C. § 841(b)(1)(A)(ii)(II).

On direct appeal, the Seventh Circuit described the general background underlying Conley's conviction:

> Tracy Conley was ensnared in a now familiar government set up in which a government actor, pretending to be a criminal, presents the defendant with an opportunity to be part of a robbery of an illegal drug stash house. The stash house is fictional, of course, and so the government decides which and what quantity of drugs it will have (in this case, fifty kilograms of cocaine) and how high or low the barriers to the crime will be (in this case it was allegedly protected only by two armed and one unarmed guards).

*United States v. Conley,* 875 F.3d 391, 394 (7th Cir. 2017). Prior to Conley's April 2012 indictment, the Seventh Circuit had commented on the "tawdry" nature of false stash house cases:

> In what's fast becoming a rather shopworn scenario in this court, [defendants], like a host of (apparently) unrelated defendants before them, were convicted of conspiring to distribute cocaine that didn't exist—cocaine they planned to liberate from a fictional stash house guarded by members of an imaginary Mexican cartel. The sting that ensnared the three defendants here was orchestrated by Bureau of Alcohol, Tobacco and Firearms ("ATF") Agent David Gomez in his undercover role as "Loquito." We have seen versions of this sting, which appears a bit tawdry, several times. We use the word "tawdry" because the tired sting operation seems to be directed at unsophisticated, and perhaps desperate, defendants who easily snap at the bait put out for them by Agent Gomez.

*United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011) (internal citations omitted); *see also United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012) (Stash house "stings are a disreputable tactic. Law enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences.") (Posner, J., concurrence). Despite these voiced opinions, the

3

United States Attorney's Office continued with stash house prosecutions for several more years, but no such prosecutions were brought after Conley's trial.

In November 2017, Conley lost on direct appeal. The Seventh Circuit nonetheless articulated the following:

> We conclude with a word about the district court's articulated dismay with the prosecution of this stash house case. In its order, the district court questioned "the wisdom and purpose of expending the level of law enforcement resources and judicial time and effort in this prosecution." At sentencing the court stated that Conley's sentence was "devoid of [ ] true fairness ... and will serve no real purpose other than to destroy any vestiges of respect in our legal system and law enforcement that this defendant and his community may have had." Specifically, the district court was dismayed that it was forced into a minimum sentence based on the government's ability to control the sentence by manipulating the amount and type of drugs that were "in" the fictitious stash house.

*Conley*, 875 F.3d at 402 (internal citations omitted).

In July 2020, the Court denied Conley's amended motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, but certified the following issues for appeal under 28 U.S.C. § 2253(c): (1) whether the ATF's practice of recruiting individuals into conspiring to rob false drug stash houses amounted to outrageous conduct violating Conley's fifth amendment due process rights; and (2) whether the ATF's conduct in targeting racial minorities for false stash house stings amounted to selective enforcement in violation of Conley's fifth amendment equal protection rights. Conley's § 2255 appeal will be fully briefed before the Seventh Circuit on March 31, 2021.

Presently, Conley is 54 years-old and is incarcerated at U.S. Penitentiary McCreary, a high security prison in Pine Knot, Kentucky. He has served nearly nine years of his sentence and his release date is June 8, 2026. His Bureau of Prison ("BOP") medical records indicate that he has a history of hypertension (high blood pressure) and that he takes medications for this condition. In December 2020, Conley tested positive for the coronavirus multiple times. From his medical records, it is unclear whether Conley has recently experienced any COVID-19 related symptoms.

**Legal Standard**

Pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), the Court may reduce an inmate's term of imprisonment after he has exhausted all "administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Once the inmate has met this exhaustion requirement, he can move the Court to reduce his term of imprisonment. In making this decision, the Court must consider whether: (1) "extraordinary and compelling" reasons warrant a sentence reduction; and (2) the sentence reduction is consistent with the sentencing factors in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A)(i); *United States v. Gunn,* 980 F.3d 1178, 1179 (7th Cir. 2020). Although the policy statements in U.S.S.G. § 1B1.13 are no longer binding authority under the Seventh Circuit's recent decision in *Gunn*, district courts may use the policy statements reflected in the comments of U.S.S.G. § 1B1.13 as guidance when exercising their discretion in determining whether extraordinary and compelling circumstances exist for compassionate release. *Id.* at 1180.

**Discussion**

Because it is undisputed that Conley has met the statutory exhaustion requirement, the Court turns to whether he has established extraordinary and compelling reasons to warrant a reduction in his sentence and if a sentence reduction is consistent with the factors in 18 U.S.C. § 3553(a).

*Extraordinary and Compelling Circumstances*

Prior to *Gunn*, the Court's determination of extraordinary and compelling reasons was controlled by the policy statements in U.S.S.G. § 1B1.13, which included three explicitly defined considerations—serious medical reasons, age, and family circumstances. U.S.S.G. § 1B1.13 cmt. n.1(A)–(C). The guideline comments also include a catch-all provision that states if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the

5

reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D). As discussed, after *Gunn*, the U.S.S.G. § 1B1.13 comments merely guide, not control, the Court's extraordinary and compelling determination. *Id.* at 1180; *see also United States v. Brooker,* 976 F.3d 228, 234 (2d Cir. 2020) ("the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances."); *United States v. Scott*, 461 F.Supp.3d 851, 862 (E.D. Wis. 2020) ("a defendant seeking compassionate release would need to demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, regular, or common, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted.").

Now that district courts can examine different extraordinary and compelling reasons for compassionate release other than those set forth in the comments of U.S.S.G. § 1B1.13, several federal courts have considered sentencing disparities, changes in the law, and the injustice of lengthy sentences when granting compassionate release motions. *See Brooker,* 976 F.3d at 238; *United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020); *see also United States v. Haynes*, 456 F.Supp.3d 496, 514 (E.D.N.Y. 2020); *United States v. Cano*, No. 95-CR-00481, 2020 WL 7415833, at *6 (S.D. Fla. Dec. 16, 2020).[1]

The Court thus turns to the inherent unfairness and injustice of Conley's sentence, especially in relation to his co-defendants, who pleaded guilty and received sentences ranging from 46 to 70 months in prison. As mentioned, the Court sentenced Conley to 180 months in prison because the Court's hands were tied by the fake drug amount, namely, fifty kilograms of cocaine, that the government arbitrarily decided was in the fake stash house, along with a fictious guard, who happened to be armed. In short, Conley's sentence was driven by the government's decisions in

---

[1] The government's reliance on an unpublished, pre-*Gunn* decision where the Seventh Circuit did not reach the issue of whether a sentence disparity was an extraordinary and compelling reason for compassionate release, offers little, if any support to its arguments in response to the present motion. *See United States v. Arojojoye*, 806 Fed.Appx. 475, 478 (7th Cir. 2020) ("The district court correctly construed Arojojoye's request as an unauthorized successive § 2255 motion.").

fabricating a false stash house and not the Court's consideration of what punishment was appropriate under the circumstances.

Adding to the injustice underlying his prosecution and sentence is that Conley was not actively involved in the planning of the false stash house robbery and in fact did not meet many of his co-defendants until the "crime" had been arranged by the Flowers brothers and their cousins the day of Conley's arrest. Indeed, in support of the present motion, Myreon, who had directly planned the fake robbery with the undercover agent, provided an affidavit stating that he had never met Conley before the day they were arrested, and that Conley was not involved in any of the planning of the robbery. Also, Conley's co-defendant, Adams, provided an affidavit averring that the day of the incident was the first time Adams had seen Conley in years. Nonetheless, Conley found himself ensnared in the ATF's scheme, not because he sought to rob a stash house or commit a crime, but because he did not have money to purchase gas for his trip home from his legitimate job and happened to run into Adams. In sum, out of the seven co-defendants, Conley was the next to least culpable, yet received the longest prison sentence by double based on outrageous and disreputable law enforcement tactics, followed by the prosecution's relentless pursuit of the sentence despite the rebuke of these cases across the country.

As the Court explained at Conley's 2015 sentencing hearing, based on the false stash house conviction, Conley's sentence was "devoid of true fairness" and served "no real purpose other than to destroy any vestiges of respect in our legal system and law enforcement that this defendant and his community may have had." If there ever was a situation where compassionate release was warranted based on the injustice and unfairness of a prosecution and resultant sentence, this is it.

In further support of compassionate release, Conley's heath issues should not be ignored. Although hypertension is not on the CDC's list of medical conditions that increase the risk of severe illness from COVID-19, the CDC gives the following guidance:

> COVID-19 is a new disease. Currently there are limited data and information about the impact of many underlying medical conditions on the risk for severe illness from COVID-19. Based on what we know at this time, adults of any age with the following conditions **might be at an increased risk** for severe illness from the virus that causes COVID-19: Hypertension or high blood pressure

(https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html) (emphasis in original). As such, Conley's hypertension, along with testing positive for coronavirus, in combination with the injustice of his conviction and sentence, constitute extraordinary and compelling reasons for his compassionate release.

*Sentencing Factors under 18 U.S.C. § 3553(a)*

Because the Court has concluded that extraordinary and compelling reasons exist for Conley's compassionate release, the Court looks to whether a sentence reduction under the circumstances is consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a). The factors listed in § 3553(a) include: (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; (3) the need for the sentence to reflect the seriousness of the offense, deter criminal conduct, protect the public, and provide defendant with educational or vocational training and medical care; (4) the types of sentences available; (5) sentencing recommendations and policy statements from the Sentencing Commission; (6) the need to avoid sentencing disparities; and (7) the need to provide restitution to the victims. *United States v. Dawson*, 980 F.3d 1156, 1162 (7th Cir. 2020); *United States v. Miller*, 834 F.3d 737, 744 (7th Cir. 2016).

As to his offense conduct stated above, Conley was one of the least culpable individuals involved in the offense. He had no involvement in the planning and executing of the robbery nor did he bring guns to the false robbery. In the ten years prior to the false stash house robbery, Conley had only one felony conviction—possession of a controlled substance in 2005. Conley's other prior convictions were committed before 2002 and include possession of a controlled substance, resisting a police officer, domestic battery, and aggravated use of a weapon. As to his

8

most serious conviction, in 1983, when Conley was 17-years old, he pleaded guilty to aggravated battery/attempted murder and was paroled after approximately four years.

Conley serving the remainder of his fifteen-year federal sentence will do little to generally deter criminal conduct because the government no longer engages in the "tawdry" and "disreputable" practice of false stash house prosecutions—due to public outrage and judicial criticism. It is only reasonable to conclude that the public is not served by Conley's continued incarceration based on a disavowed practice. Further, the Court does not consider Conley a danger to the community under the circumstances, although Conley was understandably angry and frustrated with the authorities, as well as his co-defendants who contributed to his predicament.

As for Conley's personal situation, he has three siblings who have remained in contact with him while he has been incarcerated. Conley has a release plan in place where he would reside in Chicago with his brother, Anthony, who is employed. Conley's living arrangements would put him in close proximity to his three siblings, his three children (ages 28, 23, and 15), and his four grandchildren. His siblings and adult children will provide Conley with a strong network as he transitions out of prison. Conley will also have better access to treatment for his medical conditions once released from prison and with the help of his family. Because Conley was gainfully employed at the time of his arrest and he has done some coursework in prison, a release at his current age will allow him the opportunity to return to gainful employment.

The sentencing factor that should get the most attention is Conley's sentence was over twice as long as the most culpable co-defendant, Myreon. One of the least culpable defendants, Rudy Space, was sentenced to 46 months or less than four years in prison. In fact, none of Conley's co-defendants remain incarcerated for the November 2011 stash house robbery. Conley should not be punished with a grossly disproportionate sentence, which was the result of a "trial tax," just because he maintained his innocence throughout the proceedings and asserted that the false stash house

9

stings were inappropriate. Accordingly, the sentencing factors set forth in § 3553(a) weigh heavily in favor of a sentence reduction under the circumstances.

On a final note, any risk of danger associated with this sentence reduction will be mitigated by supervised release. Once released, Conley will be placed on supervised release for three years at which time the United States Probation Office will have substantial oversight over Conley in general and in relation to the conditions of his supervised release.

**Conclusion**

For these reasons, the Court, in its discretion, grants defendant's motion for compassionate release brought pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A) [781]. Conley's sentence is reduced to time served. This order is stayed for fourteen days for the verification of Conley's residence, to finalize his release plan, to make appropriate travel arrangements, and to ensure Conley's safe release.

SO ORDERED

Sharon Johnson Coleman
United States District Judge

DATED: 3/4/2021